IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

JAN 30 2023

LAURA A. AUSTIN, CLERK
BY: s/ H. MCDONALD
       DEPUTY CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
|     Plaintiff, ) | |
| ) | Criminal No. 4:19-cr-25 |
| v. ) | |
| ) | |
| JOSHUA O'KEITH BELCHER, ) | By:    Michael F. Urbanski |
|     Defendant. ) | Chief United States District Judge |

### MEMORANDUM OPINION

This matter is before the court on defendant's motion for a new trial. ECF No. 181. Joshua Belcher ("Belcher") requests a new trial under Federal Rule of Criminal Procedure 33, claiming that the court denied him a defense by not admitting a proposed exhibit and erred by not giving a proposed defense jury instruction. The government filed a response to Belcher's motion. ECF No. 184.  As the matter has been fully briefed, the court dispenses with oral argument because the facts and legal contentions are adequately presented in the materials before the court and oral argument would not aid the decisional process.  As neither of the issues raised by Belcher weighs in favor of setting aside the jury verdict in this case, the motion for new trial, ECF No. 181, is **DENIED**.[1]

### I.

Belcher was charged in a one count indictment with possession of a firearm by a prohibited person in violation of Title 18, United States Code, Section 922(g)(1). Trial took

---

[1] On December 28, 2022, Belcher filed a Motion to Place Motion for a New Trial in Abeyance for 30 Days. ECF No. 188. That motion, also addressed herein, is **DENIED as MOOT**.

place in Danville, Virginia on July 25-26, 2022, at the conclusion of which the jury returned a guilty verdict as to Count One.

The facts of the case are straightforward. Shortly after 6 a.m. on April 20, 2019, Belcher was driving a pickup truck in the City of Martinsville. Martinsville police officer Jayme Clark noticed that Belcher's truck had a taillight out and conducted a traffic stop.[2] The jury was able to view the entirety of Clark's encounter with Belcher, both at the Valero gas station where the traffic stop occurred and at the Martinsville city jail, by means of Clark's body camera video. During the course of the traffic stop, Clark observed a firearm underneath the seat of the pickup truck. Trial Tr., ECF No. 176, at 49. Clark began questioning Belcher about the gun, to which Belcher provided no substantive response. After checking on the firearm through dispatch, Clark was advised that the firearm had been reported stolen. Id. at 60. Clark arrested Belcher. Id. at 61. Rather than impound the vehicle, Clark allowed Belcher to call his father, Roy Hairston, who was the registered owner of the truck, to come get the pickup truck. Id. at 60–61. Clark and Belcher waited for Hairston to arrive. Id. at 61. While waiting for Hairston, Clark's persistent questioning about the source of the gun continued, again without substantive response from Belcher. The body camera video shows that upon Hairston's arrival, Clark asked Hairston whether he wanted to know the details of why his son was in custody, and Hairston responded "I don't even want to know." Hairston expressed appreciation for calling him and not impounding the truck. Clark asked Hairston whether he

---

[2] Clark filed a suppression motion, which was the subject of a hearing held on January 31, 2020. As reflected in the transcript of the suppression hearing, the court denied Clark's motion to suppress, concluding that because Clark noted the odor of marijuana emanating from the pickup truck, he had probable cause to search it. The court also concluded that based upon the bodycam video of the traffic stop, Belcher consented to the search. See January 31, 2020, Hr'g Tr., ECF No. 98, at 40-42.

wanted to speak to his son, and Hairston shook his head and said "No." Clark told Hairston that he thought Belcher wanted to speak with him, but Hairston declined, stating "No, I'm good, I'll just take the keys." As the body camera video of the traffic stop was played for the jury, the jury had the ability to fully observe and assess the interactions of Clark, Belcher, and Hairston.

After leaving the Valero gas station, Clark escorted Belcher to the Martinsville city jail where Belcher asked what charges he was facing. Clark told Belcher that he had enough to charge him with possession of a stolen firearm, and asked Belcher "Did you buy it off somebody?" Belcher responded: "Yeah, but I don't know who the person was I got it from. That's why I say you won't believe it, if I tell you, you won't believe it." Again, the jury was able to view the videotaped interaction between Belcher and Clark at the jail and fully assess Belcher's statement that he bought the gun from an unknown person.

At trial, Belcher argued that the government did not prove that Belcher possessed the firearm and that his confession was coerced. Belcher's counsel also criticized the police investigation, asserting that "[t]heir method of investigation is cheap, easy, and coercive. They don't care what the truth is. They just care about giving you a story that will give them a conviction in the easiest and the quickest way possible." Closing Arg., ECF No. 177, at 267. In closing argument, Belcher's counsel addressed the failure of the police to investigate whether the gun belonged to Belcher's father, as follows:

> Because what else didn't they do? They didn't look into Roy Hairston. And you can't ignore the fact that this vehicle belongs to Roy Hairston; it's registered to him. He is a business owner; it's a work truck. And even Mr. Belcher—even Officer Clark, when he stops Mr. Belcher, he knows, he indicates he knows that Mr. Belcher is headed to work. "Are you headed to work? Are

> you going to wash cars?" And he knows all this because he knows the circumstances.
>
> He's a Martinsville police officer. He is familiar with Hairston Enterprises. He tells Roy Hairston, when he shows up to pick up the car, that he's met him before, that he's been by the shop. He testified, when he was on the stand, that he was familiar with the shop, he was familiar with Mr. Hairston, and he was familiar with that truck being at that shop.
>
> But they never investigate whether Roy Hairston is allowed to have a gun, whether he does have—you know, whether he has a concealed carry permit, whether he's allowed to have a gun in general. And so you should consider, too, that Joshua Belcher, who didn't know anything about this gun, is probably here wondering, "Could this be my dad's gun? Did my dad steal a gun?"
>
> And when Roy Hairston shows up at the scene, he doesn't want to talk to Joshua Belcher, because maybe Roy Hairston knows that if he goes over to Joshua Belcher, Josh is going to say, "Dad, what's going on with this gun?" Because he didn't know, Roy Hairston didn't know at that point that Joshua is being accused of having a firearm. Clark told you he specifically, and you saw it on the video, did not include that information. So as far as we know, unless Roy Hairston knows something that we don't in that moment, he just thinks his son is being arrested for driving on a suspended license.
>
> But if Roy Hairston knew that he left a gun in that car, he probably wouldn't want to go up to Josh at that point, because then his son is in trouble and then who knows what's going to happen afterwards if they have that conversation, with the body cams running and dash cams running and all of that. So he doesn't talk to his son even though his son wants to talk to him. You can consider that, and you should consider that.

Id. at 267–269.

Belcher asked the court to give a defense theory jury instruction as follows:

> Mr. Belcher's defense is that he did not "knowingly" possess any weapon, and that the government has not proven beyond a

4

>reasonable doubt that Mr. Belcher knew any weapon was in his father's truck.

ECF No. 181 at 3. The court declined to give this instruction as the burden of proof and the element of knowing possession of the firearm were fully covered in the jury instructions. Trial Tr., ECF No. 177, at 223–224.

## II.

Belcher's motion for a new trial argues that two rulings by the court, one sustaining the government's objection to Defense Exhibit 1, and one on a proposed defense jury instruction, were erroneous. As a result of these claimed errors, Belcher requests a new trial.

Rule 33 provides that "upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). When district courts choose to grant a new trial on grounds affecting the interest of justice, issues like the discovery of new evidence are generally involved. A trial court "should exercise its discretion to award a new trial sparingly," and a jury verdict is not to be overturned except in the rare circumstance when the evidence "weighs heavily" against it. United States v. Perry, 335 F.3d 316, 320 (4th Cir. 2003) (internal quotation marks omitted). "In deciding a motion for a new trial, the district court is not constrained by the requirement that it view the evidence in the light most favorable to the government" and "may evaluate the credibility of the witnesses." United States v. Miller, 41 F.4th 302, 315 (4th Cir. 2022) (quoting United States v. Arrington, 757 F.2d 1484, 1485 (4th Cir. 1985)).

## III.

Belcher asserts that he was denied his right to present a complete defense at trial because the court sustained the government's objection to the introduction of Defense Exhibit

5

1,[3] which consists of six pages of state court criminal records from the City of Martinsville dating back to the late 1970s and early 1980s naming Roy Lynwood Hairston[4] and concerning Sale of Marijuana and Accommodation Distribution of Marijuana.[5] Belcher sought to introduce these six pages as Defense Exhibit 1 to establish that Belcher's father was a convicted felon prohibited from possessing a firearm, which would permit defense counsel to explain away Belcher's confession to Clark that he bought the gun from an unknown person as a lie told to protect his father and to explain Hairston's unwillingness to speak with Belcher at the Valero gas station.

Belcher did not call a witness at trial to testify about proposed Defense Exhibit 1, and sought to admit it without any testimony supporting its admission. The government objected that the introduction of the old criminal documents, without more, lacked foundation and

---

[3] Defense counsel indicated that she had uploaded the documents via Box.com. Trial Tr., ECF 177, at 190, 206-208.

[4] Of the six pages, five refer to Roy Lynwood Hairston, and one page, which appears to be an appeal bond dated March 20, 1981, refers to Roy Lynwood Hairston, Jr.

[5] The documents collected at Defense Exhibit 1 and uploaded on Box.com are a bit confusing. First, it must be noted that these six pages do not include a felony criminal judgment. The first two pages, dated December 11, 1979, indicate that Roy Lynwood Hairston was tried and convicted of felony sale of marijuana and that defendant was allowed to remain on bond pending sentencing. The third page is an appeal bond for Roy Lynwood Hairston, Jr. dated March 20, 1981. This appeal bond states that on February 19, 1980, a judgment was entered against Roy Lynwood Hairston, Jr., and that he was sentenced to the state penitentiary for five years. And although the third page—the appeal bond—references that a five-year sentence was imposed on February 19, 1980, the February 19, 1980, felony criminal judgment itself is not contained in the six pages tendered as Defense Exhibit 1. Next, it is unclear whether the last three pages of Defense Exhibit 1 are related to the first three pages. The fourth page is a criminal warrant dated February 11, 1978, charging Roy L. Hairston ("Lynwood" is handwritten above his name) with distribution of marijuana as an accommodation on February 10, 1978. The fifth page appears to be a March 20, 1978, Martinsville General District Court Criminal Warrant indicating that this charge was reduced to a misdemeanor and that Roy L. Hairston (again "Lynwood" was handwritten above the typed name) was imprisoned for 30 days in jail and fined $100. The fifth page also reflects that Hairston appealed the misdemeanor judgment to Circuit Court. The sixth page appears to be an order from the Circuit Court for the City of Martinsville dated February 19, 1980, affirming the Warrant Appeal for the Accommodation Distribution of Marijuana misdemeanor conviction and imposing 30 days in jail and a $100 fine. Although the felony criminal judgment from February 19, 1980, is not included in Defense Exhibit 1, it appears to the court from the six pages of the proposed exhibit that the Circuit Court for the City of Martinsville entered judgments on Hairston's misdemeanor appeal and felony marijuana conviction on the same day, February 19, 1980.

required the jury to speculate. The defense countered that the name reflected on Defense Exhibit 1, Roy Lynwood Hairston (and on one document Roy Lynwood Hairston, Jr.) matched that of the registered owner of the truck Belcher was driving, and that this matching of the names on the documents—separated by nearly forty years—was sufficient to establish that Belcher's father was a felon prohibited from possessing a firearm. While that issue could have been readily cleared up by calling Hairston as a trial witness, neither party chose to do so. Nor did either party attempt to call the government case agent to testify as to his investigation of Hairston's criminal history.[6]

During the course of the debate over this exhibit, the court went back and forth on the foundational issue, noting both the identity of the names on the 2019 truck registration and the 40-year-old documents assembled at Defense Exhibit 1 and the commonality of the Hairston name in the Martinsville area. The court's initial ruling was to sustain the government's objection, concluding that the old criminal records, standing alone, did not "provide linkage between the name on the document and the defendant's father, the person who appeared on the video." Trial Tr., ECF No. 177, at 204. After additional defense argument focusing on the identity of the name "Roy Lynwood Hairston" appearing on the old criminal records and the recent vehicle registration, the court reversed field and announced that it would allow the admission of the exhibit. Id. at 206. After considering the matter further during a recess, the court returned to its original ruling and sustained the government's

---

[6] While each side noted at trial that Department of Justice Touhy regulations imposed procedural requirements on the defense for calling Agent Boccieri, a DOJ employee, to testify at trial as to his investigation of Hairston's criminal history, there was no suggestion that compliance with these regulations had been attempted. See Trial Tr., ECF No. 177, at 202–203, 228–229. Nor did the defendant move for a continuance to obtain procedural compliance.

7

objection to the admission of the old criminal records, noting that there was a second aspect to the foundational problem in admitting these old criminal records. As the court stated:

> [T]he defense theory is this was the reason why Mr. Belcher said, when he was back there in the police station, that he bought it from somebody. It was because he was protecting his dad, right, because of his conviction. But in order to make that link, there must be evidence that Mr. Belcher knew his dad had a conviction and that his rights hadn't been restored. That's a big leap, particularly when this conviction dates from several decades ago.
>
> This conviction is—this conviction is 40 years old, 40 years old, and there is no evidence in this record that Mr. Belcher know his father had this conviction or knew that his rights hadn't been restored.

Id. at 211. After entertaining additional argument, the court concluded as follows:

> I'm not convinced that we've overcome the foundational issue simply by having—simply by having the vehicle registration and this conviction, okay? I'm not convinced of that.
>
> I was willing to go along, thinking, oh, okay, it's relevant, it's relevant. But then, absent further evidence that the defendant—I don't know how old the defendant is, but this conviction is 40 years old. And showing—absent some relevance—absent some showing that this defendant knew his father had been convicted of a crime punishable by imprisonment by more than one year and that he had not had his rights restored, this, in and of itself—to show that he had some knowledge of this, there is a significant relevance leap that is missing in the evidence and I'm not going to admit this document.

Id. at 215–216.

Belcher asserts that the court's ruling on Defense Exhibit 1 denied him a defense because Hairston's prior felony conviction was relevant to explaining Hairston's actions upon arriving at the scene and Belcher's confession at the jail that he bought the gun from an unknown person. In moving for a new trial, Belcher asserts that this evidence was relevant

8

and its persuasiveness and impact on theories of the case could have been argued by the parties. Belcher believes that he did not need to subpoena Hairston because no matter whether Hairston testified, the notion that Belcher knew of the prior conviction would still have to be inferred. Belcher also offered that Hairston had a Fifth Amendment privilege, albeit unasserted, not to testify.

In response, the government asserts that Defense Exhibit 1 was properly excluded because of foundation and relevance issues. Foundationally, the government asserts that the introduction of the ancient state court records, standing alone, was insufficient to establish that the person reflected in those records was the registered owner of the pickup truck Belcher was driving and was prohibited from possessing a firearm in 2019. As to relevance, the government believes that Belcher's purported use of the information to aid his defense was too attenuated and speculative to warrant its admission. The government asserts that admitting the collection of state court records at Defense Exhibit 1 ran afoul of Federal Rules of Evidence 401 and 403 and its probative value was outweighed by the danger of unfair prejudice and confusing the jury.

Further, the government asserts that Belcher was not denied a defense because, at closing argument, Belcher raised the specter that it was Hairston's gun and that Belcher wondered whether his father had stolen it. The government asserts that because of the firearm's stolen status, Belcher was free to argue that his father's possession of the weapon posed him some criminal risk. Both at the Valero gas station and at the Martinsville city jail, Clark pressed Belcher with the fact that he could be charged with felony possession of a stolen firearm. See Va. Code §18.2-108.1 (prohibiting purchase or receipt of a firearm knowing that

the firearm was stolen). Because the evidence established that the firearm had been stolen, Belcher was not precluded from arguing to the jury that Hairston's conduct at the traffic stop and Belcher's confession were consistent with Hairston's ownership of the firearm.

"[A] new trial is warranted only if the verdict is against the clear weight of the evidence, based upon false evidence, or will result in a miscarriage of justice." United States v. Mallory, 988 F.3d 730, 739 (4th Cir. 2021) (citing Minter v. Wells Fargo Bank, N.A., 762 F.3d 339, 346 (4th Cir. 2014)). A trial court has broad discretion to grant or deny a defendants' motion for a new trial. United States v. Smith, 451 F.3d 209, 216–17 (4th Cir. 2006). Motions for a new trial based upon the sufficiency of the evidence are generally disfavored and are granted "only when the evidence weighs heavily against the verdict." United States v. Chavez, 894 F.3d 593, 607 (4th Cir. 2018).

The government was required at trial to prove four essential elements beyond a reasonable doubt. The first element was that "[t]he defendant knowingly possessed a firearm[.]" The second element was that "[a]t some time before defendant possessed the firearm, it was transported or shipped across state lines. However, it is not necessary for the defendant to have shipped the firearm or even that he knew that it had been so shipped or transported[.]" The third element was that "[t]he defendant had been convicted of a crime punishable by imprisonment for a term exceeding one year prior to possessing the firearm[.]" The fourth element was that "[a]t the time the defendant possessed the firearm, he knew he had been previously convicted of a crime disqualifying him from possessing a firearm." Final Jury Instr., ECF No. 165, at 26.

While Belcher asserts that the exclusion of Defense Exhibit 1 inhibited his ability to present a complete defense, that is not the case. Even without evidence that Hairston had a forty-year-old felony conviction for the sale of marijuana, it was unlawful for Hairston to knowingly receive a stolen firearm. Because the jury knew that the firearm had been stolen, Belcher was still able to argue that the illegality of possessing that gun motivated both Belcher's and Hairston's conduct. See Trial Tr., ECF No. 177 at 267–269. During closing argument, the defense sought to tie the gun to Hairston, asserting that the police "never investigate[d] whether Roy Hairston is allowed to have a gun…. And so you should consider, too, that Joshua Belcher, who didn't know anything about this gun, is probably sitting here wondering, 'Could this be my dad's gun? Did my dad steal a gun?'" Id. at 268. Counsel further argued that Hairston's possession of the gun explained his behavior when he came to pick up the truck, as follows: "But if Roy Hairston knew that he left a gun in that car, he probably wouldn't want to go up to Josh at that point, because then his son is in trouble and then who knows what's going to happen afterwards if they have that conversation, with the body cams running and the dash cams running and all of that. So he doesn't talk to his son even though his son wants to talk to him. You can consider that, and you should consider that." Id. at 268–269. As evident from the transcript of the trial, Belcher was not prevented from presenting to the jury its theory that Hairston's unlawful possession of the firearm motivated his conduct at the Valero gas station and Belcher's confession. In finding that Belcher possessed the firearm, the jury necessarily rejected counsel's argument that Belcher did not know the gun was in the truck because it was his father's gun.

Moreover, the jury's verdict was plainly supported by evidence at trial. The evidence included that Belcher was the individual driving the vehicle when the traffic stop occurred, Belcher was alone in the vehicle when stopped, the officer located the firearm under Belcher's seat after Belcher voluntarily consented to the search of the truck, Belcher voluntarily confessed to buying the gun, and all the evidence was recorded on police body camera footage of the incident and played for the jury.

Even without the introduction of Defense Exhibit 1, it was illegal for Hairston to knowingly receive a stolen firearm, and the defense was able to argue that Hairston's possession of the firearm explained both Belcher's and Hairston's conduct. Belcher had the opportunity to argue, and did argue, that Belcher was concerned that his father may have stolen a gun and that the presence of the gun caused Hairston not to speak to his son at the Valero gas station when he came to pick up the truck. Under these circumstances, the decision not to admit Defense Exhibit 1 could not have affected the jury's verdict. In reaching its verdict, the jury necessarily rejected Belcher's theory that Hairston owned the gun, and this fact weighs heavily against awarding a new trial.[7]

**IV.**

---

[7] Finally, after studying the contents of Defense Exhibit 1 in connection with the motion for new trial, the court is concerned that their introduction, without any accompanying testimony, would have confused the jury. While the court is able to ascertain the probable sequence of events reflected in the six pages of Defense Exhibit 1 after careful scrutiny, the fact remains that Defense Exhibit 1 does not include a felony criminal judgment naming Roy Lynwood Hairston, Jr. To be sure, the first two pages of Defense Exhibit 1 refer to a trial of the felony sale of marijuana and the third page is an appeal bond noting that a judgment was entered against Roy Lynwood Hairston sentencing him to prison for five years on February 19, 1980. But Defense Exhibit 1 does not include the February 19, 1980, felony judgment. It is just not there. The absence of a felony criminal judgment, taken in conjunction with the fifth page of Defense Exhibit 1, which includes the note on the Criminal Warrant "(Reduced to Misd.)," may well have confused the jury without accompanying testimony, which was never offered.

12

Belcher's second contention is that the court improperly denied him his proposed defense theory instruction. Belcher asserts that the defense theory instruction must be given as long as it is a correct statement of the law. Belcher's requested instruction was:

> Mr. Belcher's defense is that he did not "knowingly" possess any weapon, and that the government has not proven beyond a reasonable doubt that Mr. Belcher knew any weapon was in his father's truck.

ECF No. 181 at 3.

The government asserts that the withholding of this defense jury instruction was not controversial and the court did not abuse its discretion. Furthermore, the government asserts that the court's decision to reject the jury instruction passes the three part test asking (1) if the instruction is correct; (2) if the instruction is not already covered by the court's charge to the jury; and (3) if the instruction dealt with some point in the trial so important that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense. United States v. Green, 599 F.3d 360, 378 (4th Cir. 2010). The government also asserts that Belcher fully articulated his argument for the jury so his theory of the case and his emphasis on his knowledge of possession of the gun, or lack thereof, was presented and not hindered or prejudiced by the decision not to give a defense jury instruction.

A district court errs in refusing to give a jury instruction regarding a defense only if the instruction is both an accurate statement of the law and "has an evidentiary foundation." United States v. Sloley, 19 F.3d 149, 153 (4th Cir.1994); see also United States v. Gray, 47 F.3d 1359, 1369 (4th Cir.1995). Generally, deference is given to a district court to decide to give or withhold a proposed jury instruction because it is the court responsible for evaluating the evidence and formulating the jury instructions. Id. at 1368. Instructions are also viewed and

13

evaluated as a whole rather than in isolation to determine if they are correct. As the government correctly asserts, a court reviewing the jury instructions may find error if the proffered instruction "(1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense." United States v. Lewis, 53 F.3d 29, 32 (4th Cir.1995).

The jury instructions given by the court adequately covered the substance of the proposed defense jury instruction. The essence of Belcher's proposed instruction was that he did not knowingly possess a weapon and that the government has not proven beyond a reasonable doubt that Belcher knew any weapon was in his father's truck. The court instructed the jury on the elements of the offense and the burden of proof, clearly telling the jury that "the government has the burden to establish guilt beyond a reasonable doubt," Trial Tr., ECF No. 177, at 236, and that "[f]or this charge, the government must prove the defendant's intent or knowledge," id. at 246. The court further explained the knowledge requirement:

> The intent of a person or the knowledge that a person possesses at any time may not ordinarily be proved directly because there is no way of directly examining the workings of the human mind. In determining the issue of what a person knew or what a person intended at a particular time, you may consider any statements made or acts done or omitted by that person and all other facts and circumstances received in evidence which may aid in your determination of that person's knowledge or intent.

Id. The court also instructed the jury that "[t]he United States must prove beyond a reasonable doubt that the defendant knowingly possessed a firearm. 'Knowingly' means voluntarily and intentionally and not because of mistake or accident or other innocent reason." Id. The court also explained possession, as follows:

14

> A person who knowingly has direct physical control over a thing, at a given time, is then in actual possession of it.
>
> A person who, though not in actual possession, knowingly has both the power and the intention at a given time to exercise dominion and control over a thing, either directly or through another person or persons, is in constructive possession of it.

Id. Further, in explaining the elements of the offense, the court identified the first element as being "[t]hat defendant knowingly possessed a firearm," and that "[i]f the government fails to prove any one of these four elements beyond a reasonable doubt, you must find the defendant not guilty." Id. at 249. Because the proposed defense instruction was fully covered by the instructions given to the jury, there was no error in the court's decision not to give a redundant instruction.

## V.

On December 28, 2022, Belcher filed a "Motion to Place Motion for a New Trial in Abeyance for 30 Days," Mot., ECF No. 188. Belcher's motion stated:

> In support of this motion, counsel states that significant new information regarding the government's key trial witness has come to light, and that counsel has made additional requests of the government pursuant to Constitution and Due Process Protections Act, to which the government has not responded. Counsel requests 30 days in order to investigate and to research whether additional claims for a new trial can be added to the existing motion or whether new relevant facts should be considered alongside the existing motion.

Id. at 1.

On January 13, 2023, the government responded to Belcher's motion, noting that the "significant new information regarding the government's key trial witness" was the widely reported fact that on December 16, 2022, Officer Clark engaged in a videoed altercation with

15

a middle school student and was fired by the Martinsville Police Department on December 21, 2022. Resp. Opposing Mot. to Stay, ECF No. 190, at 1. No additional filings have been docketed, and the 30-day abeyance period requested by Belcher has expired.

Clark's conduct on December 16, 2022, is not relevant to Belcher's case as it transpired more than three years after Belcher's traffic stop and five months after Belcher's trial. Clark's traffic stop and Martinsville city jail encounter with Belcher were recorded on Clark's body camera which was played for the jury. As evidenced by the body camera video, Clark was not physically aggressive during his encounter with Belcher, and Clark's grabbing and shoving a middle school student on December 16, 2022, which led to his termination provides no reason to grant Belcher a new trial.

## VI.

For the foregoing reasons, Belcher's motion for a new trial, ECF No. 181, is **DENIED**, and Belcher's motion for a thirty-day abeyance, ECF No. 188, is **DENIED as MOOT**. An appropriate order will be entered.

Entered: January 30, 2023

Michael F. Urbanski
Chief United States District Judge